No. 43,940

THE STATE OF KANSAS, *Appellee*, v. ALBERT L. LESCO, *Appellant*.

(400 P. 2d 695)

Opinion filed April 10, 1965.

*Russell Shultz*, of Wichita, argued the cause, and *Larry Kirby* and *James Nelson*, both of Wichita, were with him on the briefs for the appellant.

*B. D. Watson*, County Attorney, of Independence, argued the cause, and *Robert C. Londerholm*, Attorney General, of Topeka, and *Monte K. Heasty*, Assistant County Attorney, of Independence, were with him on the briefs for the appellee.

The opinion of the court was delivered by

HATCHER, C.: The defendant was convicted on ten counts of forgery in the third degree. Five of the counts were for writing forged instruments contrary to the provisions of what is now K. S. A. 21-616, and five of the counts were for passing forged instruments contrary to the provisions of what is now K. S. A. 21-621.

The general facts which are not seriously disputed will be stated.

The evidence developed that the defendant, Albert Lesco, went to Independence, Kansas, in 1951, as a minister of the First Southern Baptist Church. He followed the ministry in Independence

until 1960, when he resigned his position at the church and purchased an interest in a company called the Audio Library Company which he operated. In 1961, the defendant opened an appliance store in Independence, Kansas, under the name of the Lesco Sales Company. This store was engaged in the sale at retail of appliances, radios, televisions and like merchandise. In November of 1962, defendant opened a branch appliance store in Coffeyville, Kansas. At the opening of the store defendant gave away a door prize for which patrons of the store and others who went there signed their names on slips of paper and placed them in a box from which a drawing was made. These names were later used in the forgeries.

The Gibraltar Finance Company was engaged in purchasing chattel mortgages and conditional sales contracts from various dealers in the area. These contracts represented the sale of merchandise by the dealers, or store owners, to their customers on credit which were then sold with full recourse to Gibraltar Finance Company who would pay the dealer in cash something less than the entire contract price.

In 1961, the defendant as the Lesco Sales Company began selling such conditional sales contracts to the Gibraltar Finance Company. In the beginning the contracts sold to Gibraltar were legitimate in all respects. After a time, however, defendant found that he needed additional operating capital for his business. He went to the Gibraltar Finance Company and was told that they were not in a position to loan operating capital to him without security.

Defendant admitted that he thereafter started selling forged conditional sales contracts to the finance company. He identified the conditional sales contracts upon which he was charged as being ones on which he signed the names of the purported purchasers and assigned them to Gibraltar; that the persons whose names he forged existed, but that he did not have authority from them to sign their names to the contracts. He further testified, after identifying the contracts introduced in evidence as being spurious, that he did not know exactly how many contracts he forged and sold to the finance company, nor did he recall all the different names that he had placed on them. Employees of the finance company testified that of the contracts purchased by them from the defendant, 248 were forgeries. They totaled in excess of $100,000.00. They also testified that the actual cash loss to the finance company from the purchase of these contracts was some $70,000.00.

The officials of the finance company testified that when they first began purchasing conditional sales contracts from the defendant, they verified the contracts with each of the customers named thereon, and the customer made payments under the terms of the contracts directly to Gibraltar. Later this arrangement was changed. The defendant asked that he be permitted to make the monthly collections from the purchasers represented by each of the contracts he had sold to Gibraltar and he in turn would remit these payments monthly to the finance company. He stated that he desired to do this because it would permit more floor traffic through his stores and thus give him an additional opportunity to make sales and for the further reason that some people objected to dealing with finance companies. The company agreed to this change in arrangements and that thereafter it would send defendant a monthly list of the contracts and the current monthly charge due.

Defendant testified that after the manner of payment to Gibraltar was modified he made the monthly payments on the contracts and that at least part of these monthly payments were made from money he received from Gibraltar by selling them other forged contracts. The payments on all the forged contracts sold by appellant to Gibraltar Finance Company were current, or approximately so, up until the time of appellant's arrest.

The first question raised by appellant reads:

"Did the Court Err in Allowing the Reading of the Testimony to the Jury Made by a Witness at a Prior Hearing Without Requiring a Proper Foundation to be Laid. Which Testimony was Prejudicial to the Appellant, and Which was Read over the Objection of the Appellant?"

The determination of the question requires the consideration of certain specific facts.

This appeal is taken from the second trial of this appellant on the information herein. The first trial commenced on October 15, 1963, and ended on October 18, 1963, with the jury being unable to agree. At that trial the state presented Sharon Metcalf who testified that she had been employed by the county attorney of Montgomery County, Kansas, during the months of May, June and July of 1963, and that on June 12, 1963, and June 18, 1963, she had been present when appellant was questioned by the county attorney concerning the transactions involved in this case; that the county attorney had advised the appellant of his rights, and that she had taken shorthand notes of the questions put to the appellant by the county attorney and the answers made by

the appellant. In the first trial the court ruled that the statements made by the appellant were voluntarily made although later repudiated by the appellant, and allowed the statements to be read into the record in the testimony of Sharon Metcalf.

In the second trial Undersheriff Lessman testified that he had taken a subpoena to the address in Independence, Kansas where Sharon Metcalf lived while she resided in that city and, not finding her, called her at her place of employment in San Bernadino, California, and that in response to, or as a result of, that phone call, Sharon Metcalf wrote a letter to the undersheriff in which she stated that she was a resident of San Bernadino, California, was married and had two children and would be unable to attend the trial from which this appeal is taken. The prior testimony was read to the jury under the testimony of Hazel S. Burris, the court reporter, who took the record of the first trial. The appellant made timely objection to the reading of the transcript of this testimony on the grounds that no proper foundation had been laid. The objections were overruled by the court.

This court has long adhered to the rule that the limitation upon the right of the state to use the testimony of an absent witness given at a former trial is dependent upon the foundation laid for the admission of such testimony. It must be made to appear that the witness who gave such testimony at the previous trial cannot by the exercise of reasonable diligence be produced. (*State v. McClellan,* 79 Kan. 11, 98 Pac. 209; *State v. Carter,* 149 Kan. 295, 87 P. 2d 818; *State v. Eason,* 163 Kan. 763, 186 P. 2d 269; *State v. Streeter,* 173 Kan. 240, 245 P. 2d 1177; *State v. Brown,* 181 Kan. 375, 312 P. 2d 832; *State v. Guthrie,* 192 Kan. 659, 391 P. 2d 95.)

Under the authority of the above cases and prior to the enactment of the Uniform Act to Secure Attendance of Witnesses from Without State it was considered that a sufficient foundation had been laid if it was established by competent evidence that the witness was absent from the state and would not voluntarily return to testify.

The appellant contends that the legislation providing for a Uniform Act to Secure Attendance of Witnesses from Without the State, which was adopted by both the State of Kansas (K. S. A. 62-2801, *et seq.*) and the State of California (Cal. Penal Code, section 1334, *et seq.*) requires as a proper foundation proof that a diligent effort was made to produce the witness under the terms of

such act. Our attention is called to *State v. Tyler*, 187 Kan. 58, 353 P. 2d 801, in which this court reversed the conviction because a proper foundation had not been laid for use at the trial of testimony given at the preliminary hearing. In the Tyler case the absent witness was the manager of the store from which the alleged theft had occurred and was in reality the complaining witness. The only testimony to support the use of the previous testimony was to the effect that when an officer sought to serve a subpoena on the witness he was informed that the witness had moved to Miami, Oklahoma. No effort was made to secure a voluntary appearance. This court took judicial notice of the fact that it was perhaps a three hour automobile ride from Miami, Oklahoma to Olathe, Kansas over excellent roads and held:

"In a criminal case, the state did not sufficiently lay a basis for the introduction of a transcript of the former testimony of an absent witness by merely offering testimony of a deputy sheriff that he attempted to serve a subpoena upon the witness and found that witness had moved to Oklahoma. It was further agreed that the state had made no effort to secure the voluntary appearance of the witness or to employ the uniform act to secure the attendance of witnesses from without the state." (Syl.)

A much different situation existed in the case under consideration. The witness was not what might be called a material or complaining witness. The only purpose of her testimony was to establish the veracity of a transcript of questions and answers which took place between the county attorney and the defendant and were transcribed by her. She also testified that the county attorney had advised the defendant of his rights. The accuracy of the witnesses transcription is not questioned. The defendant was given full opportunity to cross-examine the witness at the previous trial.

It should also be noted that the witness with her two small children was about as far removed from the place of trial as she could be and remain in the United States.

We do not believe that under the facts and circumstances as indicated that the state should be put to the trouble and expense of attempting to obtain a summons for the witness under the Uniform Act before her previous testimony was permitted to be read. The Uniform Act to Secure the Attendance of Witnesses from Without State does not provide for the delivery of a witness residing in another state as a matter of course. After a judge of a court of record of this state has certified to a judge of a court of record in the county in which the person is found that he is a

material witness in a criminal prosecution, a hearing is held and a summons to attend and testify is issued by the judge in the foreign state only if he "determines that the witness is material and necessary, [and] that it will not cause undue hardship to the witness to be compelled to attend and testify in the prosecution . . ." (K. S. A. 62-2802.) It would appear that the judge before whom the prosecution is to take place should have some discretion to determine under what circumstances resort should be had to the Uniform Act. The Uniform Act was intended as a matter of comity between states to enable states to obtain material witnesses for criminal prosecutions. It was never intended to further limit the use of prior testimony of an absent witness in a criminal prosecution.

The appellant next contends that the district court erred in transferring the trial to another division of the court and thus advancing the time of trial.

The district court of Montgomery sits in the two cities of Independence and Coffeyville.

The first trial of this case took place at Independence, Kansas, and ended in a hung jury on October 15, 1963. The court ordered a mistrial, discharged the jury and continued the case until the February, 1964, term. On November 15, 1963, the state filed its motion to transfer the case to the intervening December, 1963, term of said court sitting at Coffeyville. This motion was argued by both parties on November 27, 1963. The court found that, although this case had been continued to February, 1964, term of the district court, there was an intervening December, 1963, term of court sitting at Coffeyville; that defendant was confined in the county jail in default of bond, and that the case should be transferred to the December, 1963, term sitting at Coffeyville, "subject to usual orders of continuance upon good cause shown."

At the time the court ruled on the motion to transfer the case, the cause was set for trial to a jury on December 9, 1963.

The statutory authority for the transfer of cases between the divisions of the District Court of Montgomery County, Kansas is K. S. A. 19-1306a, which reads in part as follows:

". . . *Provided*, That any action pending in said district court sitting at either of said cities of Independence or Coffeyville may be assigned or transferred for hearing or trial to said court sitting at the other of said cities, either by order of the district court of Montgomery county, Kansas, or the judge thereof, or by stipulation of the parties."

The transfer was a matter within the discretion of the trial court.

There is nothing in the record to indicate that the discretion was abused or that the appellant's rights were in any way prejudiced.

The appellant last contends that the trial court unduly limited appellant's cross-examination; refused to allow appellant to pursue his theory of defense, and that its conduct before the jury was prejudicial to appellant.

The limits of a judicial opinion will not permit an attempt to list the numerous clashes between the court and counsel for appellant as to the propriety of cross-examination and direct examination. This controversy largely evolves from the unique defense which appellant attempted to present. The appellant presents the theory of his defense as follows:

"The Appellant's theory was that the agreement between himself and the officers of the finance company, as agents, and the finance company, was a means only of circumventing the restrictions of the Small Loan laws of the State upon the finance company, thus allowing loans of operating capital and without any intent to defraud any persons or corporations."

The appellant states further:

"The theory of the defense in this action was that the finance corporation and the sales company had discovered a means whereby the finance company could lend monies to the Appellant for operating capital without the applicable restriction of the Small Loan laws of this State. If this theory was correct, certainly the officers of the finance company, as well as Mr. Lesco, were using these contracts purely for the purpose of the record, for their mutual benefit, with the expectation that both would benefit and that no one would lose any money. . . ."

The difficulty with appellant's contention is that he was using the forged instruments to obtain money from the finance company when he knew he was in financial difficulty. He also knew that the finance company reassigned forged conditional sales contracts to banks for cash.

In *State v. Calhoun*, 75 Kan. 259, 88 Pac. 1079, this court in considering a prosecution for the offenses here charged stated at page 263 of the opinion:

". . . Proof of the giving of a forged note as collateral security for a loan of money, with the knowledge that the note was false and forged, and with an intent to defraud, is sufficient to show an uttering and passing of the forged paper; and the fact that the bank did not suffer loss nor find it necessary to realize on the collateral security does not relieve the act of its criminal character. Nor would the fact that the note as passed was not accepted as genuine by the one to whom it was offered and who therefore incurred no risk of injury from loss operate to diminish the crime."

The facts attempted to be established by the appellant did not as a matter of law constitute a defense as they might have influenced or prejudiced the jury, and the court properly made such rulings as were necessary, both on cross-examination and direct examination, to keep such evidence from the case.

A careful examination of the record discloses no trial errors which would justify the granting of a new trial.

The judgment is affirmed.

APPROVED BY THE COURT.