No. 46,682

STATE OF KANSAS, *Appellee*, v. FOREE KIRK, *Appellant.*

(505 P. 2d 619)

Opinion filed January 20, 1973.

*Charles S. Scott,* of Scott, Scott, Scott & Jackson, of Topeka, argued the cause and was on the brief for appellant.

*Larry B. McGrath,* county attorney, argued the cause, and *Vern Miller,* attorney general, and *James W. Morrison,* assistant county attorney, were with him on the brief for appellee.

The opinion of the court was delivered by

FATZER, C. J.: The appellant, Foree Kirk, was convicted by a jury of the offense of aggravated robbery as defined in K. S. A. 1972 Supp. 21-3427. The Information alleged that on October 3, 1970, Kirk robbed Joseph Earl Anderson, d/b/a Anderson's Fine Foods, 610 North Fifth Street, Manhattan, of $550 by threatening the check-out clerk, Lena Magnus, with a pistol.

The appellant's trial commenced on February 8, 1971, and the district court declared a mistrial on February 10, 1971, because the jury could not arrive at a unanimous verdict.

The appellant was again placed on trial commencing May 24, 1971, and he was found guilty by the jury, as charged. Subsequently, he filed motions to vacate the verdict and for a new trial. Both post-trial motions were overruled on June 14, 1971, and the appellant was sentenced to serve not less than seven and one-half nor more than life imprisonment for the offense.

The state's evidence consisted primarily of eyewitness testimony

of Lena Magnus, Joseph Anderson and his wife, and the testimony of an alleged co-conspirator, James Harris. A summary of the facts necessary for a decision follows:

The testimony of the Andersons and Mrs. Magnus was consistent. It reflected the Andersons were the owners of Anderson's Fine Foods; that Mrs. Magnus was one of their employees, and on the date in question she was the check-out counter cashier; that at approximately 2:30 p. m. an older black man came into the store and purchased crackers and a can of sardines and paid for them; that he then walked to the back of the store to the meat counter where he purchased a small quantity of meat; that the Andersons were present, and there were four customers in the store to the knowledge of Lena Magnus.

A young black man then entered the store and looked down one of the aisles. Later, Mrs. Magnus noticed him with a writing tablet, and it appeared he was drinking a cup of coffee. The older black man came up the aisle and placed the package of meat he had purchased on the check-out counter. The young black man then stepped up to the counter, placed the tablet on the counter, pulled a pistol from his jacket pocket, and said, "this is a hold-up." Mrs. Magnus was threatened, and the older man became passive. Mrs. Magnus was directed to put the contents of the cash register into the sack. She complied, and the holdup man ordered her not to move, and he and the older man ran out the door. Mrs. Magnus ran to the back of the store screaming she had been robbed.

Both Anderson and his wife identified the appellant in a lineup at the Manhattan Police Department and he was again identified by them from the witness stand. Mrs. Magnus also made an independent in-court identification of the appellant as the one being in the store on October 3, 1970.

James Harris, also known as George Smith, an alleged accomplice of the appellant, appeared as a witness for the state at the appellant's first trial; he had been granted immunity from prosecution by the state in an inquisition in which he was subpoenaed to appear. Immediately after testifying at the first trial, Harris left the state for parts unknown. The state sought to have Harris' testimony at the first trial used in the second trial. Following a lengthy hearing out of the presence of the jury, the district court admitted evidence by the state for the purpose of establishing a

foundation to permit Harris' testimony at the first trial, to be read to the jury.

John Fay, a member of the Riley County bar, was called as a witness. He had represented Harris at the inquisition and had assisted in securing immunity from prosecution for Harris when he turned state's witness. He testified Harris was no longer in the state of Kansas, and claimed attorney-client privilege as justification for not being at liberty to disclose Harris' whereabouts, either to the county attorney or to anyone else. He indicated he had Harris' last mailing address which was in a state on one of the coasts of the country, and that he assisted the county attorney and deputy sheriff Ray Markwald in making arrangements and providing funds for Harris and his family to leave Manhattan prior to the conclusion of the first trial. Fay stated the first and only time the county attorney had asked him for Harris' address was the morning the second trial commenced.

Markwald testified he received a subpoena on May 21, 1971, to be served on Harris, three days before the second trial commenced. He stated he gave the subpoena to Sheriff Anderson who attempted to find Harris at his former Manhattan address, but to no avail. Markwald also testified he was present when Harris was transported by bus from Manhattan prior to the conclusion of the first trial, and to his knowledge arrangements had been made through the county attorney's office for Harris' bus fare.

Andrew Dubish, a detective of the Manhattan Police Department, testified he had sought Harris' whereabouts from several confidential informants, and that no one knew where Harris was. He stated he had not contacted Fay as to Harris' whereabouts and did not recall whether the county attorney had indicated Harris was to be a witness at the trial until the morning of the second trial when Dubish was asked to attempt to locate Harris.

The county attorney testified he provided lodging in a Manhattan motel for Harris and his family on February 5, 1971, prior to the commencement of the first trial.

As reflected in the testimony of both Fay and McGrath, Harris was in fear for the safety of himself and the members of his family. An agreement had been made with Harris whereby he would be permitted to leave Manhattan immediately upon testifying so he would not be subjected to possible abuse and physical harm as a result of his testimony. Those arrangements were carried out prior to the

determination of appellant's first trial which ended in a hung jury. By the time the first trial had ended, Harris had already left the jurisdiction and McGrath did not require him to post bond as a material witness prior to leaving the state.

The state made a proffer of Harris' testimony given at the appellant's first trial. Over the objections of the appellant that the state did not lay a proper or sufficient foundation for the admissibility of the testimony, the district court admitted Harris' testimony.

The substance of Harris' testimony was that he was the older black man at the check-out counter when the robbery occurred. He stated he participated in the crime and shared in the proceeds. Having been granted immunity from prosecution for his participation in the holdup, he then fingered the appellant. The appellant was identified as the young black man who robbed Mrs. Magnus at gunpoint, thus corroborating the testimony of Joseph Anderson, his wife, and Lena Magnus.

The appellant took the stand and evidence offered by him consisted mainly of an attempt to establish an alibi for the time in question. Testimony was offered by the appellant's aunt and his girl friend, who is now his wife, to the effect that he was at the home of his aunt with his aunt's husband between 2:00 and 2:30 p. m. on the afternoon the Anderson store was robbed, and his wife testified he came home about 3:00 p. m. on the afternoon in question. The appellant's testimony corroborated that of his aunt and his wife. He also produced a witness purporting to establish his good character.

The appellant contends the district court erred in admitting Harris' testimony given at the former trial, because the state did not lay a proper foundation to establish it made a reasonable effort to procure his attendance at the second trial. This court has considered the admissibility of the testimony of an absent witness given at a former trial, or at a preliminary hearing, on many occasions. The rule adopted in this state may be found in *State v. Washington,* 206 Kan. 336, 479 P. 2d 833, where it was said:

"Under the federal constitutional standard as applied to the states, the test of unavailability, for the purposes of the exception to the confrontation requirement, is whether the prosecutorial authorities have made a 'good faith effort' to obtain the witness's presence at trial (*Barber v. Page,* 390 U. S. 719, 20 L. Ed. 2d 255, 88 S. Ct. 1318). Consistent with the federal mandate is our long-standing rule that before the state may use the testimony of an absent witness

given at a former trial or preliminary hearing, it must be made to appear the witness cannot, by the exercise of reasonable diligence, be produced at trial (*State v. Lesco*, 194 Kan. 555, 400 P. 2d 695; *State v. Guthrie*, 192 Kan. 659, 391 P. 2d 95; *State v. Brown*, 181 Kan. 375, 312 P. 2d 832; *State v. Bonskowski*, 180 Kan. 726, 308 P. 2d 168; *State v. Streeter*, 173 Kan. 240, 245 P. 2d 1177. . . .)." (1. c. 338.)

See *State v. McClellan*, 79 Kan. 11, 98 Pac. 209; *State v. Tyler*, 187 Kan. 58, 353 P. 2d 801; *State v. Guthrie*, 192 Kan. 659, 391 P. 2d 95; *State v. Lesco*, 194 Kan. 555, 400 P. 2d 695, cert. den. 382 U. S. 1015, 15 L. Ed. 2d 529, 86 S. Ct. 628, and *State v. Terry*, 202 Kan. 599, 451 P. 2d 211. See, also, *State v. Calvert*, 211 Kan. 174, 505 P. 2d 1110.

This court has not attempted to define the term "reasonable diligence" with the preciseness that other legal phrases may be identified. Analysis of our previous cases establishes that each case turns on its own facts and circumstances to determine the availability of a witness.

To establish unavailability for purposes of the confrontation requirement the state put on foundation evidence to show it had made a good-faith effort to secure Harris' presence at the second trial. As indicated, on the morning the second trial commenced, Fay testified Harris was no longer in the state. That alone would not be sufficient to justify waiver of the confrontation guaranty. (*Mancusi v. Stubbs*, 408 U. S. 204, 33 L. Ed. 2d 293, 92 S. Ct. 2308.)

While there was some effort made to locate Harris at his former Manhattan address, we think what was not done was highly significant. Prior to the order of mistrial at the conclusion of the appellant's first trial, the state paid for and assisted in shipping Harris outside the state to parts unknown; however, it did not require bond pursuant to K. S. A. 1972 Supp. 22-2805, to insure Harris' presence at a second trial, if one were necessary. Knowing that Harris was beyond the borders of the state, it made no attempt to find his whereabouts, nor did it make demand upon Fay for Harris' out of state address. This would seem to be required by the rule stated in 97 C. J. S., Witnesses, Sec. 286, p. 812, to the effect that an address given confidentially by a client to an attorney while consulting with him in a professional capacity is, as a general rule, a privileged communication, but in a proper case the court has power to compel an attorney to disclose the residence of his client. See Anno: 16 A. L. R. 3d, 1047. In short, we are of the opinion the state made no affirmative good-faith effort to find Harris. Rather,

the scope of the efforts as frankly conceded by the county attorney, was limited in effect to "covering its tracks," so to speak, the morning the second trial commenced, in an attempt to show the court it had made a good-faith effort to insure the appellant's right to confront Harris as a witness against him. The county attorney testified:

"Q. In other words, you did nothing to secure his presence here today, is that correct?

"A. Well yes, we issued a subpoena.

"Q. I am talking about following the trial in February, the 8th and those days following.

"A. After February 9 and when he left in the morning after he testified, I do not know where he is.

"Q. Your answer is you haven't done anything to secure his presence here following the mistrial in this case to secure his presence?

"A. That's correct—there was nothing to do.

"Q. O. K., so there was nothing to do. You knew we had to try this case again, didn't you, Mr. McGrath, after the mistrial was declared by His Honor?

"A. I didn't know where he was and still don't know where he is today."

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. All right, at any rate the first time that you made any effort to try to locate the witness, Mr. Harris, was Friday of this month, which would be the 21st, that was the issuance of a subpoena?

"A. We, neither the police department nor my office had any knowledge of his whereabouts, and I have not had since the trial and do not have now.

"Q. My question was, you did nothing to try to secure his presence here until May 21, 1971, is that correct?

"A. Mr. Harris had no family other than his wife to our knowledge."

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. When did you start finding out where he was—or trying to find out his whereabouts?

"A. It hasn't changed from February 9, 1971.

"Q. You knew this matter was coming on for trial on the 24th of May immediately after the opening day of this court for the May term, did you not, Mr. McGrath?

"A. That's correct.

"Q. All right, did you at that time do anything to try to ascertain the whereabouts of Mr. Harris?

"A. There was nothing to do, Charles."

The absence of a witness from the jurisdiction does not provide a sufficient ground for suspension of the confrontation requirements of the Sixth Amendment to the United States Constitution and Section 10 of the Bill of Rights of the Kansas Constitution, particularly in view of the procedural tools now available to the prosecution to insure attendance of material witnesses and the increased cooperation between states and the federal government

with respect to securing the attendance of witnesses from without this state. (See *Lesco* and *Washington,* supra; see, also, *Barber v. Page,* 390 U. S. 719, 20 L. Ed. 2d 255, 88 S. Ct. 1318; *Mancusi v. Stubbs,* supra.)

We hold the efforts on the part of the prosecution to secure Harris' presence at the second trial do not equate with "reasonable diligence." This court is of the opinion the district court erred in admitting the testimony of Harris given at the first trial because the state failed to establish a sufficient foundation for the admissibility of the testimony by showing Harris was unavailable. *(State v. Calvert,* supra.)

In conclusion, the decision in this case is not to be construed as requiring the prosecution in each case to exhaust the remedies of the Uniform Act to Secure Attendance of Witnesses from Without State as a condition precedent to a determination by the district court that a witness is unavailable, thus justifying an exception to the confrontation requirement. As was indicated by the United States Supreme Court in *Mancusi v. Stubbs,* supra:

"The Uniform Act to secure the attendance of witnesses from without a State, the availability of federal writs of habeas corpus ad testificandum, and the established practice of the United States Bureau of Prisons to honor state writs of habeas corpus ad testificandum, all supported the Court's conclusion in Barber that the State had not met its obligations to make a good-faith effort to obtain the presence of the witness merely by showing that he was beyond the boundaries of the prosecuting State . . ." (33 L. Ed. 2d p. 301.)

The holding in this case is limited to the facts and circumstances as disclosed by the record and in no way alters our holding in *State v. Lesco,* supra.

Other specifications of error raised by the appellant need not be considered as the admissibility of Harris' testimony disposes of the case on appeal.

The judgment is reversed and remanded to the district court with instructions to grant the appellant a new trial consistent with this opinion.

SCHROEDER, FONTRON, and KAUL, JJ., dissent.