(629 P.2d 734)

No. 51,961

Leah Chute, as Administrator of the Estate of Willis Upshaw, Deceased, *Appellant,* v. Old American Insurance Company, *Appellee.*

Opinion filed June 5, 1981.

*Robert D. Hecht,* of Scott, Quinlan & Hecht, of Topeka, for the appellant.

*Herbert A. Marshall,* of Marshall, Hawks, Hendrix, Schenk & Nichols, of Topeka, for the appellee.

Before JUSTICE HERD, presiding, SWINEHART, J., and WILLIAM M. COOK, District Judge, assigned.

COOK, J.: Plaintiff appeals from a judgment entered by the district court following a trial on the merits. The action was a sequel of sorts to the Carpenter murder cases which have been before the Supreme Court on three separate occasions. (*State v. Carpenter,* 215 Kan. 573, 527 P.2d 1333 [1974]; *Carpenter v. State,* 223 Kan. 523, 575 P.2d 26 [1978]; *State v. Carpenter,* 228 Kan. 115, 612 P.2d 163 [1980].)

Leah Chute, Administratrix of the Estate of Willis Upshaw, deceased, brought this action to recover from the defendant, Old American Insurance Company, the proceeds of two policies of life insurance issued by defendant upon the life of Upshaw. Tawnya R. Upshaw, Toni R. Upshaw and Troy W. Upshaw are the natural children of Leah Chute, born to her during and as a result of her marriage to Willis Upshaw, the natural father of said minor children. It is undisputed that the minor children are all of the heirs at law of Willis Upshaw under the law of intestate succession of the State of Kansas.

Willis Upshaw was employed by separate partnerships comprised of Jan Carpenter and Eben W. "Bill" Carpenter, as equal partners, d/b/a C & C Security Company and C & C Ambulance. He worked intermittently as a patrol guard and ambulance attendant for the two companies. On May 16, 1972, the Carpenters initiated the purchase of life insurance policies upon the life of Willis Upshaw. On that date Upshaw signed applications with Old American for two insurance policies of $50,000 each, naming C & C Security Company and C & C Ambulance Company, respectively, as beneficiaries under the policies. The defendant declined to issue policies in that amount but did issue two policies in the amount of $25,000 each, and these policies were delivered to the Carpenters on June 15 or June 16, 1972. A premium check in the amount of $239.10 dated June 15, 1972, was delivered to defendant's agent upon delivery of the policies.

The evidence at trial revealed that the Carpenters had also made application on or about June 8, 1972, to American Home

Life Insurance Company for life insurance on the life of Upshaw, with the Carpenters as beneficiaries, in the amount of $70,000 with double indemnity provisions. Although there was testimony that defendant would not have issued its two policies if knowledge of the additional insurance had been acquired, there were no provisions in defendant's application forms which required this information. The only information requested of the applicant was whether there was "any other application for life, accident, sickness or hospital insurance *now pending* in this or any other company." (Emphasis added.)

Willis Upshaw was murdered on July 2, 1972. Subsequently, Donald Brenner, the "trigger-man," and Jan Carpenter pled guilty to, and Eben W. Carpenter was tried and found guilty of second-degree murder and were sentenced.

Following the death of Upshaw, the Carpenters attempted to collect the proceeds of the two policies but were precluded from recovery since they were guilty of the murder of Upshaw. This lawsuit was then brought by Leah Chute, administratrix of the Upshaw estate. Following a trial on the merits, the court entered judgment for the defendant, holding that the Carpenters intended to murder Upshaw at the time the policies were obtained and thus the policies were void ab initio because of such fraud.

Plaintiff contends the trial court erred in the following respects: (1) by failing to find the plaintiff proved a prima facie case indicating that she should recover against the defendant; (2) in concluding that the policies of insurance were void ab initio; (3) in determining that the defendant's failure to return or tender the premiums paid did not preclude their presentation of defenses which involved misrepresentation; (4) in allowing hearsay testimony; and (5) in failing to sustain the plaintiff's motion for summary judgment. We will consider each of the contentions in the order designated.

Plaintiff first asserts she has proven that policies of insurance were issued on the life of Willis Upshaw; that the premiums thereon were paid and at no time prior to the death of Upshaw was any notice of cancellation given to anyone; that Upshaw was murdered by the beneficiaries of the policies who by reason of their felonious deeds are disqualified to receive the benefits of the policies; that an insurance company is not relieved of liability under a life insurance policy merely because the beneficiary's

right to recover is forfeited by reason of the felonious killing of the insured by the beneficiary but, rather, is liable to pay the proceeds of the policy to the insured's estate; and that she, as the duly appointed administratrix of Upshaw's estate, is the proper party to bring this action to recover the proceeds of the policies. Therefore, plaintiff reasons she has "met her burden and proved that the Defendant is obligated to pay the Plaintiff all sums due under the policies in question . . . ."

Plaintiff's reasoning and conclusion would be correct except for the fact she ignores the finding of the trial court that the Carpenters had formed an intent to kill Upshaw at the time the policies were issued.

K.S.A. 59-513 provides that:

"No person who shall be convicted of feloniously killing, or procuring the killing of, another person shall inherit or take by will, by intestate succession, as a surviving joint tenant, *as a beneficiary under a trust or otherwise* from such other person any portion of the estate or property in which the decedent had an interest . . . ." (Emphasis added.)

In *Noller v. Aetna Life Ins. Co.,* 142 Kan. 35, 41, 46 P.2d 22 (1935), the court, interpreting the prior statute containing similar language, held that the words "or otherwise" would apply to a case where the person who did the killing was the beneficiary in an insurance policy.

Plaintiff is correct in proclaiming that an insurer is not relieved of liability under its policy simply because the beneficiary killed the insured. 46 C.J.S., Insurance § 1171 states, in part, as follows:

"*Liability of company to estate.* Ordinarily where the assignee or beneficiary is defeated by his felonious act in causing the death of insured, the liability of the company, sometimes by virtue of statutory provisions, is not canceled or extinguished; and in such case the amount of the policy becomes payable, as part of insured's estate, to the heirs or personal representatives who in the absence of the assignment or designation of a beneficiary would have been entitled to the proceeds of the insurance, even though it is not expressly so provided by statute." (pp. 58-59.)

See *Protective Life Ins. Co. v. Linson,* 245 Ala. 493, 17 So. 2d 761 (1944); *Knights of Honor v. Menkhausen,* 209 Ill. 277, 70 N.E. 567 (1904); *Kascoutas v. Federal Life Ins. Co.,* 193 Iowa 343, 185 N.W. 125 (1921); *National Life Ins. Co., etc. v. Hood's Adm'r,* 264 Ky. 516, 94 S.W.2d 1022 (1936); *Slocum v. Metropolitan Life Ins. Co.,* 245 Mass. 565, 139 N.E. 816 (1923); *Sharpless v. Ancient Order of United Workmen,* 135 Minn. 35, 159 N.W. 1086 (1916);

*Equitable Life Assur. Soc. of the U.S. v. Weightman,* 61 Okla. 106, 160 Pac. 629 (1916); *Smith v. Todd,* 155 S.C. 323, 152 S.E. 506 (1930).

There is, however, an exception to the above rule which plaintiff has overlooked in her conclusion that she was entitled to recovery on her claim against defendant. That exception is set forth at 4 Couch on Insurance 2d § 27:159 (1960):

> "An exception to the rule that the liability of the insurer is not affected by the beneficiary's unlawfully killing the insured may arise when the beneficiary is also guilty of fraud with respect to the insurer. For example, if it is established that the beneficiary conceived the idea of murdering the insured prior to the time the insurance was procured and with that thought in mind the beneficiary himself procured the policy, either in person or acting through the insured as an innocent instrumentality so that the insurance policy was, in actual effect, at its inception a contract between the beneficiary and the insurance company, as distinguished from a contract between the innocent insured and the company, the insurance company may defeat liability on the ground of fraud. Under this principle recovery is barred even by the estate of the insured."

In a discussion of the same subject matter, at 46 C.J.S., Insurance § 1171, it is stated that if a life insurance policy "was procured by the beneficiary with the predetermined intent to murder [the] insured, it is wholly void at its inception for fraud . . . ." p. 59. See also 1A Appleman, Insurance Law and Practice § 382 (1965).

This "predetermination to kill" rule was considered in *Colyer's Adm'r v. New York Life Ins. Co.,* 300 Ky. 189, 188 S.W.2d 313 (1945). In that case the beneficiary murdered the insured within a short time after purchasing insurance. The jury found that at the time the life insurance was obtained, Duncan, the beneficiary, had already determined to kill Colyer, the insured. Upon this finding the trial court entered judgment for the insurance company, holding that the insured's estate could not recover under the policy. On appeal the Kentucky Supreme Court stated:

> "In the case at bar it is clearly established that there was a predetermination on the part of Duncan, before the policy was issued, to kill Colyer. Under such a circumstance there can be no recovery, either on the part of the beneficiary or the estate of the insured, because the contract of insurance was void from the inception." p. 192.

See also *New England Mut. Life Ins. Co. v. Null,* 554 F.2d 896 (8th Cir. 1977); *New England Mut. Life Ins. Co. v. Calvert,* 410 F. Supp. 937 (E.D. Mo. 1976); *Aetna Life Ins. Co. v. Strauch,* 179 Okla. 617, 67 P.2d 452 (1937).

From the foregoing, it appears to be a well-established rule of law that an insurer is relieved of all liability under a life insurance policy if it can be proved that the policy was procured by the beneficiary who intended at the time the insurance was secured to murder the insured. We see no reason why this rule should not be adopted in this state.

In the instant case, plaintiff asserts that even if the "predetermination to kill rule" is recognized in Kansas, the trial court erred in finding defendant had proved by clear and convincing evidence that Carpenters intended to kill Upshaw for the proceeds of the life insurance policy at the time the policies were procured. We do not agree.

In order to meet her burden for recovery in this case, plaintiff was only required to prove that the policies were issued and premiums paid, they were not cancelled, and that the insured was killed by the beneficiary who became disqualified to receive the policy proceeds. Even though that burden was borne by plaintiff, it does not follow that the trial court erred in failing to grant her judgment. Defendant in its answer alleged fraud in the procurement of the policy and had the right to go forward with evidence to prove that defense. In so doing it was necessary for defendant to prove the alleged fraud by clear and convincing evidence. As was stated in *Hoch v. Hoch,* 187 Kan. 730, 732, 359 P.2d 839 (1961):

"It is hardly necessary to list the citations of authority on the long-standing rule in this state that one who asserts fraud must prove it by a preponderance of the evidence; that such evidence should be clear, convincing and satisfactory, and that it does not devolve upon the party charged with committing the fraud to prove the transaction was honest and bona fide. Fraud is never presumed; it must be proved. Mere suspicion is not sufficient. [Citations omitted.]"

The trial court found that this burden was sustained by defendant by proving "that at the time of the application of the insurance on the life of Upshaw, it was the clear intent of the two partners to kill Mr. Upshaw and recover the benefits and to receive the benefits of the policy." Did the evidence support this finding?

Where the trial court makes findings of fact and conclusions of law, as was done in this case, "the function of this court on appeal is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to

support the trial court's conclusions of law." *City of Council Grove v. Ossmann,* 219 Kan. 120, Syl. ¶ 1, 546 P.2d 1399 (1976).

At trial, defendant called Donald Brenner as a witness. Brenner was an employee of the Carpenters during the time in question. It was he who admittedly killed Upshaw and subsequently entered his plea of guilty to a charge of murder in the second degree. He had also been called as a State's witness in the prosecution of Eben W. Carpenter. The pertinent portions of Brenner's testimony in the instant case were as follows:

"Q. (By Mr. Marshall) Where did you first have a discussion with the Carpenter's concerning their plan, which was stated to you, regarding Mr. Upshaw and his disposition?

.   .   .   .

"A. The parking lot area of their offices.

"Q. (By Mr. Marshall) How long in time was that prior to July 2nd, 1972?

"A. As best I can recall, it was a month. Maybe six weeks, somewhere in that time span. I can't give you more definite than that.

"Q. Who was present at the time of the conversation?

"A. Jan Carpenter, Bill Carpenter and myself.

"Q. Now which of them, if either, was doing the talking or making the conversation?

"A. As my memory serves me, I believe it was Bill.

"Q. I want you to tell the Judge what Bill Carpenter said about their plans with regard to Upshaw at that time.

.   .   .   .

"A. Like I said, he had just come from his attorney's office, at that time Erny Rice. And he came up there and said Erny says, 'We have got to kill that damn Upshaw off.' That was almost the exact quote he made. And this was a month or six weeks, somewhere along in there.

"Q. And what further conversation was there at that time concerning their plan or intention to carry that out?

"A. I couldn't really say at that time what plan they discussed. I know there were later discussions where they were trying to figure out some way to do it.

.   .   .   .

"Q. (By Mr. Marshall) Let's go to the next occasion when there was first a discussion about carrying this plan out. Where did that discussion take place?

"A. The next one I can think of was in the back bay. It was a converted garage and it was in the back bay area of the office area. In other words, where the office building was, and Jan and Bill were talking about in my presence.

.   .   .   .

"Q. (By Mr. Marshall) Can you tell us approximately how long after this first discussion or how long before July 2nd?

"A. I would say within a week after the first discussion.

"Q. And tell the Judge what was said at that time.

"A. It was in the afternoon because I had just gotten off work at 4:00 o'clock. They were talking about setting him up some way to make it look like he had, for instance, been changing a tire on his car at Stubbs Road. And getting a jalopy someplace and running over him that way to make it look like an accident. That is the first discussed plan I heard them talking about.

"Q. Did discussions later continue regarding other plans?

"A. Yes. I can't remember the dates or the place. Other than I can remember some conversations, but I couldn't give you a date or a place. Like I say, it has been eight years.

"Q. In any event, it was between the date of this discussion about using an auto accident and the date of the murder, wasn't it, or the killing?

"A. Yes.

"Q. Can you pinpoint the date any better than that?

"A. No; I am afraid not. I couldn't.

. . . .

"Q. [By Mr. Hecht] The conversation which you testified to, sir, that occurred at a time and shortly after or on the same day that one of the Carpenters had come from Mr. Rice's office -

"A. Yes. The initial conversation, yes.

"Q. Could it have been less than a month before the actual killing?

"A. I don't think so. I think it was probably closer to six weeks. But I will give you a time frame of a month to six weeks. That is really as close as I could give you, really."

The trial court found that the application for insurance was made on May 16, 1972, and that the policies were issued on June 16, 1972. The court further found that "the insurance policies were obtained with the intention on the part of the owners and beneficiaries of the policies to murder Upshaw." There was no attempt made by the plaintiff to rebut the testimony of Brenner that the Carpenters had formed the intent to murder Upshaw at least four weeks, and perhaps six weeks, prior to his murder on July 2, 1972. Therefore, the evidence clearly established that the beneficiaries of the policies in question first formed an intent to murder the insured between May 20, 1972, and June 2, 1972, well before the issuance and delivery of the policies.

We now come to the real crux of this appeal. Plaintiff points out, and correctly so, that there was absolutely no evidence presented in the trial that the Carpenters had ever formed an intent to murder Upshaw prior to, or at the time of, the application for insurance. Therefore, plaintiff argues, defendant failed in its burden to prove an intent to defraud at the time the policies were procured. Plaintiff further argues that an intent to murder

the insured after the application was filed and while waiting for approval would not constitute fraud. In support of her argument, plaintiff cites *Meyer v. Johnson,* 115 Cal. App. 646, 2 P.2d 456 (1931), and *Aetna Life Ins. Co. v. Strauch,* 179 Okla. 617. Those cases, however, do not support plaintiff's contentions. In *Meyer* the insurer did not assert or attempt to prove that the beneficiary either procured the policy or possessed an intent to murder at the time of issuance. The court in *Strauch* recognized the principle that when a beneficiary, either in person or acting through the insured as an innocent instrumentality, procures a policy of life insurance, intending at the time to murder the insured, the insurance company may defeat liability on the ground of fraud. The court noted that such defense would not be available simply because the beneficiary or some other party entertains a secret intent to murder one who is procuring insurance so long as "the expected murderer does not participate in procuring the insurance in such a manner to become, in effect, the party who contracts with the insurance company." 179 Okla. at 618.

It may be conceded that most, if not all, of the textbook authorities, along with most reported cases, refer to the time of the "procurement" of the policy when determining the intent of the beneficiary. (46 C.J.S., Insurance § 1171; 4 Couch on Insurance 2d § 27:159; 1A Appleman, Insurance Law and Practice § 382; *N.Y. Mut. Life Ins. Co. v. Armstrong,* 117 U.S. 591, 29 L.Ed. 997, 6 S.Ct. 877 [1886]; *Aetna Life Ins. Co. v. Strauch,* 179 Okla. 617.) Plaintiff would limit our interpretation of that term to mean at the time of "application" of the policy. We believe such a limited construction would serve to defeat the obvious intent of the "premeditation to kill" rule. Insurance companies are entitled to the same protection against fraudulent contracts as any other contracting party under similar circumstances. The law will not enforce the provisions of a contract when one party has fraudulently induced the other party to assume a liability that he would not have accepted except for the fraudulent representation.

An application for insurance is not a contract of insurance; it is only an offer to purchase insurance. The contract does not come into existence until the offer is accepted and the policy is issued and delivered, or premiums are accepted. If fraud is perpetrated by one of the parties to the contract prior to the effective date of the policy, liability may be avoided by reason of the fraud. To

avoid liability under such circumstances, it is sufficient to show that the fraud was committed prior to the effective date of the policy. We can find no rationale to limit the fraud to the time of application rather than to the effective date of the policy.

In *Colyer's Adm'r v. New York Life Ins. Co.*, 300 Ky. at 191, the trial court instructed the jury as follows:

"The Court further instructs the jury that if it shall believe from the evidence that the said Finley Duncan procured Edward Colyer to make application for such policy, or to pay the premium thereon, or to designate the said Finley Duncan as beneficiary thereof, and that at the time said policy *was applied for or was issued, or was delivered or the premium thereon was paid,* the said Finley Duncan had already determined to slay, kill and murder the said Edward Colyer, then the jury will return a verdict for the defendant, New York Life Insurance Company." (Emphasis added.)

On appeal the foregoing instruction was approved and the court held that under such circumstances "there can be no recovery, either on the part of the beneficiary or the estate of the insured, because the contract of insurance was void from its inception." p. 192.

The uncontradicted evidence in the instant case revealed that the Carpenters enticed Upshaw to apply for two policies of life insurance and to name them as beneficiaries thereon; that prior to the issuance and delivery of the policies and the payment of premiums thereon, the beneficiaries determined to murder the insured. We therefore hold the trial court did not err in finding the policies void ab initio.

We need to touch upon one further matter before leaving this issue. Plaintiff contends the evidence failed to show that the Carpenters intended to murder Upshaw for the insurance proceeds and, therefore, defendant failed to prove the policies were procured by the partners with the intention of killing the insured. The record reveals that neither party inquired of Donald Brenner as to why the Carpenters wanted Upshaw murdered. However, his testimony did reveal the following:

"Q.   (By Mr. Marshall) Mr. Brenner, at any time during this period of time, did you overhear any discussion, or were you told by the Carpenter's concerning what plans they had for the insurance money upon the death of Upshaw?

.   .   .   .

"A.   Yes.

.   .   .   .

"Q.   (By Mr. Marshall) I am not asking you the date. I just want you to tell the

Judge the best you can when you had these discussions with reference to either July 2nd or—

"A.  (Interrupting) I think the discussion in this reference, I believe, was after the incident. But I could not swear to that for sure.

"Q.  You mean after the death?

"A.  After the death, yes. Could have been close one way or the other. I really don't remember."

Was it necessary, as plaintiff claims, for defendant to prove by direct evidence that the motive for murdering Upshaw was to collect the insurance proceeds or may the same be inferred from the other competent evidence in the case? Fraud is normally a secretive act and must be concealed for success. This is especially true where the fraud, as here, amounts to a criminal act which, if exposed, will result in criminal prosecution. Therefore, considerable latitude should be granted in the introduction of evidence to prove the fraud. *Brakefield v. Shelton,* 76 Kan. 451, 453, 92 Pac. 709 (1907). Seldom can fraud be expressly shown, and evidence of the circumstances of the transaction itself must often be relied upon to establish the fraudulent act. *Breidenthal v. Breidenthal,* 182 Kan. 23, 30, 318 P.2d 981 (1957). Kansas has long recognized the general rule that fraud may be shown by circumstantial as well as by direct and positive proof. *Kansas Wheat Growers Ass'n v. Windhorst,* 129 Kan. 528, 283 Pac. 638, *modified* at 131 Kan. 423, 292 Pac. 777 (1930); *Hampson v. Spong,* 103 Kan. 400, 173 Pac. 909 (1918); and *Kurt v. Cox,* 101 Kan. 54, 165 Pac. 827 (1917). Even though it must be proved by a preponderance of the evidence which must be clear and convincing, fraud, like any other fact, may be proved by showing circumstances from which the inference of fraud is natural and irresistible; and if such circumstances are established and they are of such a character as to produce in the mind of the trier of fact a conviction of the fact of fraud, then it must be considered that fraud is proven. *Reeser v. Hammond,* 122 Kan. 695, 697-98, 253 Pac. 233 (1927).

The record before us clearly establishes by the direct, uncontradicted testimony of Brenner the intent and scheme of the Carpenters to murder Upshaw prior to the issuance of the insurance policies in question. Further, on June 8, 1972, an additional application for life insurance upon the life of Upshaw was made with another company. It is only logical to infer, in the absence of direct evidence of motive, that the insurance money was at least a contributory, if not the sole, reason for the murder. Presumptions

"must have substantial probative force as distinguished from surmise." *Farmers Ins. Co. v. Smith,* 219 Kan. 680, 689, 549 P.2d 1026 (1976). We believe the evidence here established the natural and irresistible presumption that the insurance proceeds at least were a motivating factor in the death of Upshaw. The opposing presumption would be that the Carpenters were in no way motivated by the insurance policies when discussing and planning the murder of Upshaw. The policies in question totaled $50,000, a sum difficult to ignore. Such a presumption is totally contrary to common knowledge and experience.

We next consider plaintiff's contention that defendant was estopped from presenting its defense of fraud because it failed to return the premiums received. K.S.A. 40-419 states:

"In suits brought upon life policies heretofore or hereafter issued, no defense based upon misrepresentation in obtaining or securing the same shall be valid unless the defendant, at or before the trial, shall deposit in court for the benefit of the plaintiff the premiums received on such policies."

The clear purpose of the statute is to prevent insurance companies from retaining the benefits of premiums paid while at the same time denying coverage. The record reveals that the Carpenters, not the deceased insured, purchased the policies and paid the premiums. Therefore, the plaintiff, as administratrix of Upshaw's estate, had no legal claim to the premiums paid to defendant. The trial court noted that this issue was not raised until final arguments and would not at that late date estop defendant from proving the contract void ab initio. Under these circumstances the trial court did not err. Although not received into evidence because the issue was only raised after the parties had completed presentation of their evidence, the court observed that defendant had available and could have introduced a copy of a letter from defendant to the Carpenters' attorney tendering back the premiums received.

We next consider the question of hearsay evidence. Plaintiff's counsel made timely objection to the testimony of Donald Brenner regarding statements made to him, or overheard by him, by the Carpenters. The trial court allowed the testimony as an exception to the hearsay rule under K.S.A. 60-460 (*h*), (*i*) or (*j*). If the court erred, then plaintiff was clearly prejudiced because the basis of the court's findings of fact was the testimony of Brenner. Without the testimony of Brenner there was no competent direct

evidence to support the trial court's finding that the Carpenters intended to murder Upshaw prior to the issuance of the policies.

"Evidence of a statement which is made other than by a witness while testifying at the hearing offered to prove the truth of the matter stated is hearsay evidence and inadmissible" unless otherwise admissible under one of the exceptions enumerated under K.S.A. 60-460. Subsections (g), (h) and (i) of the statute deal with admissions and are indicative of those who may make admissions. To be binding upon a party, the admission must be made by the party in his individual or representative capacity or by his authorized agent. *Miller v. Sirloin Stockade,* 224 Kan. 32, 34, 578 P.2d 247 (1978). We do not believe that the exceptions set forth in K.S.A. 60-460 (h) or (i) are applicable to the present case as found by the trial court. The Carpenters were not parties to this action nor were they acting in a representative capacity for either party when their statements were made to or in the presence of Brenner.

K.S.A. 60-460 (j) provides an exception for declarations against interest and permits the admission of statements which were at the time of their assertion so far contrary to the declarant's pecuniary, proprietary, penal or social interests that a reasonable man would believe the statements would not have been made unless the defendant believed them to be true. This subsection broadens the former Kansas case law by eliminating the requirements of unavailability of the declarant, and by expanding the interests to include declarations against penal or social interests along with pecuniary or proprietary interests. The former rule was that a declaration of a person who has since died was admissible in evidence if the declaration was against the pecuniary or proprietary interests of the declarant "although not a part of the *res gestae,* and although the declarant was not a party nor in privity with a party to the action." *Mentzer v. Burlingame,* 85 Kan. 641, 643, 118 Pac. 698 (1911). Now the requirement of unavailability is not necessary. As stated in *Thompson v. Norman,* 198 Kan. 436, 442-443, 424 P.2d 593 (1967):

"This [K.S.A. 60-460 (j)] broadens our former law in the realm of declarations against interest by those not parties to the action nor in privity with a party to the action, as exceptions to the hearsay rule. Formerly there was a requirement of unavailability of the declarant as a prerequisite for reception of this character of testimony, and declarations were limited to those against the pecuniary or proprietary interest of the declarant (*Hurley v. Painter,* 182 Kan. 731, 324 P.2d 142).

Now, the statute dispenses with the requirement of unavailability and expands the interests to include penal or social.

"The statute does, however, require, as a preliminary measure of trustworthiness, that the trial judge, prior to admission of such a declaration, make a finding that the character of the declaration was of such nature a reasonable man would not make it unless he believed it to be true. Probability of veracity is the safeguard sought; the reasonable man test is the criterion to be used. . . . And it should be kept in mind he is concerned with admissibility, not weight, of evidence."

See also *State v. Prince,* 227 Kan. 137, 147, 605 P.2d 563 (1980), wherein the court held that the test of admissibility under K.S.A. 60-460 (*j*) was correctly stated in *Thompson v. Norman.*

It should be observed that some confusion may have been caused in *State v. Quick,* 226 Kan. 308, 317, 597 P.2d 1108 (1979), wherein the court held:

"K.S.A. 60-460 (*j*) contemplates that the judge, using judicial discretion, find the statement 'was at the time of the assertion so far contrary' to the declarant's penal interest 'that a reasonable man in the declarant's position would not have made the statement unless he or she believed it to be true.' In addition, if the declarant is not present at trial it must appear a diligent effort was made to locate the declarant and that he is unavailable. Originally in order for such evidence to be admissible it had to be shown the declarant was dead. Now in those jurisdictions recognizing the rule it is generally sufficient to show the declarant is unavailable. 5 Wigmore on Evidence § 1476, p. 350 (Chadbourn rev. 1974)."

The necessity to determine the unavailability of the declarant in a criminal proceeding is required, however, not because of the provisions of K.S.A. 60-460 (*j*), but rather because "[u]nder both the federal and state constitutions a defendant charged with a crime is entitled to be confronted with the witnesses against him—that is, to meet them face to face." *State v. Terry,* 202 Kan. 599, Syl. ¶ 1, 451 P.2d 211 (1969). See also *State v. Kirk,* 211 Kan. 165, 505 P.2d 619 (1973); *State v. Washington,* 206 Kan. 336, 479 P.2d 833 (1971). This constitutional requirement of confrontation is not necessary in civil actions, nor is it required under the provisions of K.S.A. 60-460 (*j*). See *State v. Myers,* 229 Kan. 168, 171-172, 625 P.2d 1111 (1981).

The trial court did not explicitly find prior to the admission of Brenner's testimony "that the character of the declaration was of such nature a reasonable man would not make it unless he believed it to be true." *Thompson v. Norman,* 198 Kan. at 443. Nevertheless, the court read K.S.A. 60-460 (*j*) into the record at the time the objection was raised and inherent in its ruling was the finding required by *Thompson v. Norman.* Therefore, we believe

the trial court correctly received the testimony of Brenner as an exception to the hearsay rule under K.S.A. 60-460 (*j*). The statements made by the Carpenters were clearly against their pecuniary, penal and social interests.

Plaintiff also argues the trial court erred in allowing double hearsay, *i.e.*, that Carpenter said Ernie Rice said "We have got to kill that damn Upshaw off." The record reveals, however, that this testimony was only introduced to show that the statement was made to Brenner by Carpenter prior to the issuance of the policies, thus proving that the Carpenters were at least considering the possibility of killing Upshaw at that early date. The statement was not introduced or received for the purpose of proving the truth of what Ernie Rice purportedly said. Under such circumstances, the court did not err in receiving this evidence. As stated in *Malone v. New York Life Ins. Co.*, 148 Kan. 555, 558-559, 83 P.2d 639 (1938):

"It has been said that the theory of the rule against hearsay is that when the utterance is offered as truth of the fact asserted, the credit of the assertor becomes the basis of inference and therefore can be received only when the assertor is on the stand and subject to cross-examination, but that if the utterance if offered, not as an assertion to evidence the matter asserted, but without reference to its truth, the rule does not apply."

Plaintiff finally contends the trial court erred in failing to grant her motion for summary judgment. In her motion the plaintiff relied upon "the discovery record and the uncontroverted statement of facts, and the memorandum of law, filed in support of the motion for summary judgment filed by plaintiff" in Leah Chute, next friend, mother, natural guardian and conservator of Tawnya R. Upshaw, Toni R. Upshaw and Troy W. Upshaw, minors v. Old American Insurance Company, case No. 122,560 in the District Court of Shawnee County, Kansas. The court overruled the motion for summary judgment finding that there were genuine issues of material facts remaining to be tried.

Supreme Court Rule No. 141, 225 Kan. lxviii, requires that motions for summary judgment shall contain, among other things, separately numbered paragraphs of uncontroverted contentions of fact relied upon by the movant. The record before us does not contain the uncontroverted statement of facts filed by plaintiff in case No. 122,560 and we, therefore, do not know the nature of the record before the district court at the time plaintiff's motion was overruled. The burden is upon the appellant to

designate a record sufficient to present her points to this court, and to establish the claimed error. *Farmers Ins. Exchange v. Schropp,* 222 Kan. 612, 625-626, 567 P.2d 1359 (1977). In the absence of an adequate record, the claimed error need not be considered by this court. *Lewis v. Lewis,* 4 Kan. App. 2d 165, 168, 603 P.2d 650 (1979).

Affirmed.