No. 73,387

STATE OF KANSAS, *Appellee*, v. LAMONTE E. MCINTYRE, *Appellant*.

(912 P.2d 156)

Opinion filed March 8, 1996.

*Lindsey P. Erickson*, of Overland Park, argued the cause, and *Carl E. Cornwell*, of Overland Park, was with her on the brief for appellant.

*Terra D. Morehead*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: This is a direct criminal appeal from convictions of two counts of first-degree murder following a jury trial. Lamonte McIntyre alleges the following errors: (1) The trial court erred in failing to give an instruction regarding eyewitness identification; (2) the State failed to disclose evidence in its file relating to the issue of guilt; (3) the trial court erred in not considering all of the eight factors set out in K.S.A. 38-1636(e) in certifying him to be tried as an adult; and (4) there was insufficient evidence to convict him of the offenses. Finding no reversible error, we affirm.

On April 15, 1994, Donald Ewing and Doniel Sublette were shot and killed as they sat in a car in Wyandotte County, Kansas. McIntyre, age 17, was charged with two counts of first-degree murder in connection with the killings.

Two eyewitnesses identified McIntyre as the shooter. Niko Quinn, who lived near the scene of the crime, testified that at 2 p.m. on April 15, she was walking out of her house when she noticed a blue car parked up the street. She stated that there were two people in the car, although she could not see who they were. Quinn began to walk up the street to use the telephone when she saw someone running through a nearby vacant lot. As Quinn watched, the individual approached the parked car armed with what looked like a shotgun, walked up to the passenger side of the car, and began shooting. Quinn stated the individual was a black male, dressed in black. She also testified she later found out the two victims were her cousins, Donnie Ewing and Doniel Sublette.

The next day, the police asked Quinn to look at a series of photographs. She told Detective Roger Golubski she did not know if any of the pictures she was shown were of the shooter. A week later she called Golubski and told him that she could positively identify the shooter. At trial, Quinn identified McIntyre as the shooter.

Golubski testified that during the course of the investigation, McIntyre's name surfaced as a possible suspect. Various sources mentioned that McIntyre might have been involved, and as a result, McIntyre's picture was included in the photo lineups shown

to eyewitnesses Quinn and Ruby Mitchell. According to Golubski, when Quinn first looked at pictures in the lineup, she was very deliberate in looking at each one. When she came to the picture of McIntyre, she held onto the photograph, became teary-eyed, and was shaking. However, she told him that she was not sure whether that person was the shooter. Within a week, she called him and asked to meet him at a neutral location to look through the photos. She then picked out McIntyre's photograph as that of the shooter.

On cross-examination, Golubski was asked whether he had told anyone about showing Quinn the photographs a second time. He answered that he had not notified anyone until after the preliminary hearing.

After Golubski was excused from the stand, and out of the presence of the jury, the defendant's attorney asked the court to be allowed to make a record. McIntyre's counsel then stated, "I would like to know when [the prosecutor] was advised by Detective Golubski of this second photo lineup." The prosecutor answered that she was not sure when she had been told of the lineup but that she did not feel a duty to disclose it because it was not exculpatory evidence. She admitted there was nothing in the file about the lineup. McIntyre's counsel stated that he did not believe that there was a second photo lineup and that Golubski was not being truthful. However, the trial court noted that McIntyre's counsel had the chance to cross-examine Golubski. McIntyre's counsel made no objection to the lineup or the testimony of Golubski.

The second eyewitness, Ruby Mitchell, a neighbor of Quinn's, testified that on the afternoon of April 15, she heard Quinn yelling to someone up the street and walked to the door of the house. Mitchell saw an individual come down the hill, walk over to a parked car, and begin shooting. Mitchell testified that the individual was armed with a short rifle or "pump gun." The shooter was dressed in a black shirt and black cap. Mitchell thought that the shooter was someone named Lamonte who used to date her niece. She mentioned this name to police. Despite the similarities in first names, the Lamonte to which she was referring and the defendant, Lamonte McIntyre, are not the same person.

When shown a photograph lineup, Mitchell picked McIntyre's photo as the one of the shooter. At trial, Mitchell testified that there was no doubt in her mind that McIntyre was the shooter.

Detective James Krstolich of the Kansas City, Kansas Police Department testified that he had assisted Golubski in interviewing Mitchell. He worked with Mitchell to attempt to build a composite drawing of the suspect. Mitchell told him that the shooter's name was Lamonte. Sometime later, the name of a different person, McIntyre, came up in the investigation, but Krstolich had no personal knowledge as to why.

The State also presented the testimony of Lieutenant Dennis Barber of the Kansas City Police Department. According to Barber, when he inquired as to McIntyre's whereabouts on the day of the shooting, McIntyre's mother told him that McIntyre had been at FiFi's Restaurant, where she was employed, all day. Later, McIntyre's mother told Barber that for 4 hours, including the approximate time of the murder, he had been with her at FiFi's. Barber also testified he arrested McIntyre on the same day as the murder, and McIntyre told him that he had been helping out his mother at the restaurant all day.

McIntyre presented an alibi defense. Peggy Crowder, his aunt, testified that McIntyre was at her house on the day of the shooting until approximately 2:45 p.m., although she acknowledged that he was with his mother from 9 to 10:30 a.m. on that day. She testified that the only time he left the house after 10:30 a.m. was to go next door and call a cab for two of her sons. She stated that the first time he called the cab was at approximately 1:45 p.m., and the second time he went to call a cab was approximately 2:15 p.m.

Felicia Williams, a cousin of McIntyre's, testified. She stated that on the day in question, McIntyre came over to her mother, Peggy Crowder's, house at 10 a.m. and stayed until 2:45 p.m.

Yolanda Johnson, another aunt of McIntyre's, testified McIntyre came over to call a cab. She testified that at approximately 2:45 p.m., McIntyre came back over to her house and stayed until his mother came to pick him up.

M'sheria Johnson, daughter of Yolanda and a cousin of McIntyre, testified that McIntyre came over to Yolanda's house at 2:10

p.m., left briefly, and then came back over to use the phone. After leaving again briefly, McIntyre came back and stayed at the house from 2:45 p.m. until his mother came to get him at 5 p.m.

McIntyre testified on his own behalf. He stated that he had spent the night of April 14 at Crowder's house. The next morning, he left to do something at his mother's house and then went back to Crowder's house. He testified that he left Crowder's house on two occasions between 1:20 p.m. and 1:50 p.m. to go to Yolanda's house to call cabs for his cousins. He did not leave again until his mother came to get him some time between 4:30 p.m. and 5 p.m.

McIntyre denied knowing the victims of the crime or even owning a gun. He stated that he heard about the killing when "some dude" walked by on the street and mentioned that Chris Quinn's brother had been shot.

## Eyewitness Identification Instruction

At the conference regarding jury instructions, McIntyre's counsel informed the trial court that he would not be requesting a jury instruction regarding eyewitness testimony. He stated that he was satisfied with the instructions as prepared. The State then asked the court to make a record regarding the eyewitness jury instruction for purposes of appeal. The court stated that because both eyewitnesses had a good view of the shooter and because the witnesses were certain of the identification, the eyewitness instruction would not be given.

McIntyre now argues that eyewitness identification was an essential part of the State's case and that the failure to give a cautionary instruction was clearly erroneous. We have stated that a party may not assign as error the giving or failure to give an instruction unless he or she objects to or requests the instruction, stating the specific grounds for the objection. Absent such an objection or request, an appellate court may only reverse where the trial court's failure to give the instruction was clearly erroneous. *State v. Edwards*, 252 Kan. 860, 864-65, 852 P.2d 98 (1993). The failure to give an instruction is clearly erroneous only if the reviewing court reaches a firm conviction that if the trial error had not

occurred there was a real possibility that the jury would have returned a different verdict.

In determining whether there is a question about the reliability of eyewitness identification, this court in *State v. Warren*, 230 Kan. 385, 390, 635 P.2d 1236 (1981), identified five factors to be considered when evaluating the testimony of an eyewitness. These included (1) the opportunity of the witness to view the defendant at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior descriptions of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. The *Warren* court examined these factors in determining whether an instruction was necessary. 230 Kan. at 397-98.

Applying the factors in *Warren* to the facts of this case, it is apparent that both Niko Quinn and Mitchell had an opportunity to view the shooter. Quinn testified that she first noticed the shooter as he was walking through a nearby vacant lot. Mitchell noticed the shooter as he was coming down the hill near the victim's car. As far as the degree of the witness' attention, while Quinn testified that she was not really paying attention when she first saw the shooter, she stated that when the crime was committed she got a good look at the shooter. Mitchell testified that she was paying attention to the shooter and was specifically looking at his face during the crime.

The next factor to be considered is the accuracy of the witness' prior description of the criminal. Both witnesses' descriptions of the shooter matched McIntyre's appearance.

The fourth factor is the level of certainty demonstrated by the witness at the confrontation. Quinn herself testified that she did not initially identify the photograph for the police, not because she was unsure of whether the photograph was that of the shooter, but because she feared reprisal by the shooter if she identified him. Both witnesses were certain of their identification of McIntyre at trial.

Another factor to be considered is the length of time between the crime and the identification. Mitchell's identification of McIntyre from the photographic lineup took place on the day of the

shooting. Quinn was shown the photographs the day after the shooting, although for reasons outlined above she did not make a positive identification until approximately a week later. As a result, there was no significant lapse of time between the crime and the identification.

Other factors not mentioned by the *Warren* court but highlighted by PIK Crim. 3d 52.20 (1995 Supp.), the instruction regarding eyewitness testimony, include the emotional state of the witness and whether the witness had observed the alleged perpetrator on an earlier occasion. Quinn's cousins were the victims of the crime, which might have had some effect on her emotional state; however, she testified that she did not know who was in the car until after the shooting. There is no indication that either she or Mitchell felt especially threatened at the time of the crime. Neither of the witnesses had seen McIntyre before.

It must be emphasized that McIntyre's counsel did not request an instruction on eyewitness identification and, when given the opportunity, he affirmatively stated to the court he had decided not to request an instruction on eyewitness identification. In response to this statement, the State requested for the purposes of appeal that the court make a record as to why it elected not to give an eyewitness instruction. The court responded:

"The eyewitness instruction I think should be used when there's a question about identity, whether the witness and the alleged defendant are the same race, the amount of time the witnesses had to view the defendant, the circumstances surrounding their viewing the defendant, how soon they made their identification after the alleged incident occurred, whether or not they were sure in their identification, how many subsequent identifications were made and obviously their demeanor during court, how they testified and how sure they were of the identification. In the court's opinion, frankly, the two eyewitnesses in this case Niko being one and Ruby is the other one. Niko's testimony was that she got a good look at the individual. Nothing blocked her view. She concentrated on the face. She gave a description of the clothing. She later picked the defendant's photograph out of a five photograph lineup, became extremely upset. In fact, she was shaking. Her eyes were teary. She—the officer had difficulty getting that photograph from her grasp. When asked whether or not she was sure she indicated that looked like the individual but I can't be sure. I can't be sure. Obviously there was some emotional trauma involved with that particular selection of that particular photograph. For the record that was the defendant's photograph. According to

the testimony in this case she later contacted the detective who provided her with the photographic lineup, indicated to him she feared retribution if she had identified the photograph at that time. After further consideration she decided that the debts of her relatives should be I think the word was justified. I suspect they mean vindicated. And she indicated to the detective that positively that was the individual that had committed this crime. In fact, she was sure at the time she was shown the photographs the first time it was on this afraid [sic] to indicate that to the detective.

"The second witness Ruby indicated she was positive when she saw the photographs that that was the man who had shot the two individuals in the car. Just prior to that she had helped in the compilation of a composite drawing from an Identi-Kit supplied by Detective Krstolich. Her testimony was before she contributed to the composite drawing she had thought the individual who had done the shooting was a man by the name of Lamonte who had dated her niece. She was so sure in fact that she indicated at that time she almost called out, Lamonte, what are you doing, just before the individual fired the shots into the car. She indicated that after the composite and sometime either during or before the photographic lineup she picked photograph No. 3, which was a photograph of the defendant and said positively and absolutely that was the man that had done the shooting. Whether there was any confusion about the two Lamontes at all, she attempted to explain by saying they're identical. That the two individuals looked the same but by the time she saw the photographic lineup she indicated she was positive that was the individual who had done the shooting the, defendant in this case Lamonte McIntyre.

. . . .

"Further, here in court their identification of the defendant was absolute, positive, no mistake, no doubt at all. For those reasons I do not believe the fact circumstances in this trial merit an identification instruction and it's certainly in light of the fact defense has not requested the same nor has state for that matter. For those reasons I am not including [an] eyewitness instruction in the general instructions and I believe that's satisfactory record on that particular issue."

We conclude that the failure to give an eyewitness identification was not error. Based upon the above circumstances, the record supports the decision of the trial court not to give such an instruction.

*Failure to Disclose Information Regarding the Second Photo Lineup*

McIntyre next argues the State prejudiced his rights by failing to disclose information regarding a second photo lineup in which Quinn identified him as the shooter. According to McIntyre, this failure on the part of the State affected the result of the trial be-

cause, armed with this information, he would have been better prepared to cross-examine Quinn and Golubski regarding the lineup.

The facts surrounding this alleged failure to disclose are as follows: Quinn testified that, when interviewed the day after the crime, she told Golubski she could not identify the shooter. However, she stated that about a week later she called Golubski and told him that she could make an identification. When Golubski testified, however, he stated that Quinn contacted him and asked to see the photographs again, and when she had done so, she identified McIntyre.

McIntyre's counsel cross-examined Golubski as to whether a report regarding this second photo lineup was made. Golubski stated that he told the prosecutor about the lineup at some time between the preliminary hearing and the trial. Outside of the presence of the jury, McIntyre's counsel asked the prosecutor when she had become aware of the second photo lineup. The prosecutor stated that she could not remember when she had been told of the information, but that at the time she did not feel that it was necessary information to be disclosed to the defense because it was not exculpatory.

McIntyre now argues the State was obligated to disclose the information regarding the second photo lineup. According to McIntyre, the pretrial order in the case required that the State disclose all evidence on the issue of McIntyre's guilt.

Prosecutors are under a positive duty, independent of court order, to disclose exculpatory evidence to the defendant. *State v. Nguyen*, 251 Kan. 69, 81, 833 P.2d 937 (1992). In addition, the State agreed at the pretrial conference to open its file to counsel for McIntyre for examination until two weeks before trial and represented that it had disclosed all evidence favorable to McIntyre on the issue of guilt.

The subsequent identification of McIntyre as the shooter by Quinn was inculpatory evidence. Thus, there was no independent duty on the part of the State to affirmatively disclose this evidence. A defendant does have a constitutionally protected privilege to request or obtain from the prosecution evidence which is material to

the guilt or innocence of the defendant. See *State v. Carmichael*, 240 Kan. 149, 152, 727 P.2d 918 (1986). However, the defense made no attempt to interview Quinn or Golubski regarding whether Quinn would be able to identify McIntyre.

McIntyre claims that the pretrial order affirmatively requires that the State disclose all evidence relevant to his guilt or innocence, whether exculpatory or inculpatory, and that the failure to do so was a denial of fundamental fairness. However, the pretrial order merely states that the State had turned over exculpatory evidence to the defense and that the file on the case would be open for the defense's examination. The record establishes that McIntyre made no request to examine the State's file on the case. Finally, although McIntyre now argues that he objected to the introduction of the second photo lineup, the record does not support his assertion.

Quinn testified that she called the police and told them that she could identify the shooter. The defense was presented with the opportunity to cross-examine her as to why she could identify the shooter a week after the shooting though she told police she was not sure of the identity the day after the event. The defense also had the opportunity to cross-examine Golubski as to why Quinn was able to make an identification the second time. Based upon all circumstances, we conclude that the failure of the State to disclose the second lineup was not a denial of fundamental fairness.

*Certification to Stand Trial as an Adult*

K.S.A. 38-1636(a)(2) provides that the court may authorize the prosecution of a respondent 16 or more years of age as an adult. In determining whether or not prosecution as an adult should be authorized, the court is required to consider the following factors:

"(1) The seriousness of the alleged offense and whether the protection of the community requires prosecution as an adult; (2) whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner; (3) whether the offense was against a person or against property, greater weight being given to offenses against persons, especially if personal injury resulted; (4) the number of alleged offenses unadjudicated and pending against the respondent; (5) the previous history of the respondent, including whether the respondent had been adjudicated a delinquent or miscreant under the Kansas juvenile code or a juvenile

offender under this code and, if so, whether the offenses were against persons or property, and any other previous history of antisocial behavior or patterns of physical violence; (6) the sophistication or maturity of the respondent as determined by consideration of the respondent's home, environment, emotional attitude, pattern of living or desire to be treated as an adult; (7) whether there are facilities or programs available to the court which are likely to rehabilitate the respondent prior to the expiration of the court's jurisdiction under this code; and (8) whether the interests of the respondent or of the community would be better served by criminal prosecution." K.S.A. 38-1636(e).

The standard for evaluating whether the decision to certify a juvenile as an adult was proper is whether the decision as a whole is supported by substantial competent evidence. *State v. Tran*, 252 Kan. 494, 508, 847 P.2d 680 (1993). The insufficiency of the evidence pertaining to one or more of the factors listed is not determinative. *State v. Hooks*, 251 Kan. 755, 759, 840 P.2d 483 (1992).

At the certification hearing, Denise Armstrong, McIntyre's probation officer, testified that he was on probation for an earlier robbery, had previously been arrested for misdemeanor theft, and was also facing a charge of possession of cocaine. According to Armstrong, McIntyre would not be a good candidate for probation and, due to his age, SRS custody would also not be an option. Armstrong felt that he might be committed to the Youth Center, but that the maximum time he could be held at that facility would be 3 years. Armstrong felt that the defendant was of an emotional maturity level consistent with his age.

McIntyre contends the trial court did not consider all of the factors listed. Specifically, he contends the trial court failed to consider the sixth and seventh factors: the sophistication and maturity of the defendant and the availability of facilities and programs likely to rehabilitate the defendant prior to the expiration of the court's jurisdiction under the juvenile code.

However, an examination of the record demonstrates that McIntyre's argument is without merit. First, in making its decision, the court announced that it had considered all of the factors in K.S.A. 38-1636. Moreover, the court specifically stated that it had considered the maturity of the respondent, his age, and the fact that the juvenile system could not be of benefit to him. The court reached its conclusions on these factors after hearing evidence and

arguments from both sides which thoroughly addressed the factors. Under these circumstances, the trial court did not fail to properly certify McIntyre as an adult.

McIntyre also contends there was not substantial competent evidence to support the trial court's decision to waive him to adult status. However, the record is replete with evidence that supports the finding of the trial court. Regarding the factor of the seriousness of the alleged offense, the crime for which McIntyre was being tried was first-degree murder, the most serious crime against a person. The offenses were committed in a violent, premeditated manner, and were against two people. At the time of trial, McIntyre was 17 years old, and as a result, an adjudication under the juvenile system could only keep him in custody until the age of 21. Under these circumstances, substantial competent evidence exists to support the decision of the trial court.

*Sufficiency of the Evidence*

McIntyre argues that the evidence was insufficient for the jury to have found him guilty beyond a reasonable doubt. He argues that there was no physical evidence or motive to connect him with the crime.

When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, we are convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Timley*, 255 Kan. 286, Syl. ¶ 13, 875 P.2d 242 (1994).

McIntyre argues that because there was no physical evidence to connect him to the crime, and because the State did not establish a motive for him to commit the crime, there was not sufficient evidence to convict him. However, McIntyre was identified by two eyewitnesses to the crime who picked him out of a photo lineup. Viewing all the evidence, in the light most favorable to the prosecution, we are convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt.

Affirmed.