**NEW ENGLAND MUTUAL LIFE INSURANCE COMPANY, Plaintiff–Appellant,**

v.

**Lorna ANDERSON, Individually, and in her capacity as parent and natural guardian of her minor children, Lori D. Anderson, Julie L. Anderson, Janelle L. Anderson & Jennifer L. Anderson, and Larry J. Putnam, Solely in his capacity as personal representative and administrator of the estate of Martin K. Anderson, deceased, Defendants–Appellees.**

Nos. 87–2883, 89–3080.

United States Court of Appeals, Tenth Circuit.

Oct. 16, 1989.

P. Terence Crebs of Caruthers, Herzog, Crebs & McGhee, St. Louis, Mo. (Rexford H. Caruthers and Michael A. Vitale of Caruthers, Herzog, Crebs & McGhee, St.

Louis, Mo., and David A. Hanson of Glenn, Cornish, Hanson & Karns, Topeka, Kan., with him on the brief), for plaintiff-appellant.

Edward J. Hund of Focht, Hughey, Hund & Calvert, Wichita, Kan. (Ricky E. Bailey of Focht, Hughey, Hund & Calvert, Wichita, Kan., with him on the brief), for defendants-appellees.

Before McKAY, SETH and BALDOCK, Circuit Judges.

SETH, Circuit Judge.

New England Mutual Life Insurance Company brought this diversity action seeking a declaratory judgment that it was not obligated to pay $270,000 under an insurance policy issued on the life of Martin Anderson because the policy had been fraudulently procured. Lorna Anderson Eldridge, Martin Anderson's widow (since remarried) who was a defendant below, filed a counterclaim seeking the policy proceeds. She later disclaimed any interest in the proceeds, and prosecuted the counterclaim on behalf of the four minor children of the marriage. At the conclusion of trial on August 28, 1987, the jury found that the policy had not been fraudulently procured. New England was held liable for the full amount of the policy. In these two consolidated appeals, New England argues that the trial court erred in instructing the jury on the issue of procurement; in excluding certain evidence and testimony at trial; and (No. 89–3080) in denying New England's Rule 60(b) motion for relief from judgment. We affirm.

Martin and Lorna Anderson lived in Emporia, Kansas with their four daughters. He was a chief medical technologist and she worked as secretary to a local Lutheran pastor named Tom Bird. Martin Anderson had "always been one to have life insurance and be concerned about it," his brother testified. Mr. Anderson had attended a seminar on life insurance and owned life insurance since at least 1980. A fellow employee of Martin Anderson testified that Mr. Anderson more than once encouraged him to increase his insurance coverage and acted like an insurance salesman.

Martin Anderson had previously purchased life insurance of New England in March 1982. This was a $300,000 term life policy purchased from agent Chris Kimble whom Martin Anderson knew in the Optimist Club. However, when premiums on the policy went unpaid starting in December 1982, the policy lapsed.

This case concerns a second New England policy on Martin Anderson's life. In April 1983, Lorna Anderson visited the agent Chris Kimble at his office. She discussed life insurance with him, and he gave her a policy application which she took with her when she left. Martin Anderson met with Mr. Kimble after an Optimist Club meeting some time later. Mrs. Anderson was not present. Together they filled out the blank application form which the agent had given Mrs. Anderson earlier, and which Martin Anderson had brought with him. He applied for a $270,000 policy that included whole life, term life, and an accidental death benefit. He tendered a check for $90 to the agent, and in May he submitted to examinations required by New England which then issued the policy on May 26, 1983. Mr. Kimble later discussed with Mr. Anderson the details of the policy, at Mr. Anderson's request.

Lorna Anderson became involved with the Reverend Tom Bird, and took a job at his church to be close to him. Eventually they came to view Martin Anderson as an obstacle to their happiness, and to view murder as the solution to their problems. To this end, they approached a Mr. Carter for help in hiring a hit man to kill Mr. Anderson. Although they paid $5,000 to Mr. Carter in September 1983, the murder did not take place as planned.

However, Martin Anderson was murdered on November 3, 1983. Martin and Lorna Anderson were returning to Emporia from Fort Riley. Lorna Anderson, who was driving, feigned illness and pulled over to the side of the road. She persuaded Mr. Anderson to get out of the family van. Reverend Bird, who had been waiting at the predesignated roadside spot, shot Mar-

tin Anderson several times in the head with a .22 pistol that Lorna Anderson had provided him earlier. Mr. Anderson died at the scene.

New England complains that the instructions to the jury were defective. The trial court enjoys substantial latitude in tailoring the instructions so long as they fairly and adequately cover the issues presented. Challenges to the trial court's language or formulation of the charge are reversible only for an abuse of discretion. *Richards v. Attorneys' Title Guar. Fund, Inc.*, 866 F.2d 1570, 1573 (10th Cir.). A party has no vested interest in any particular form of instructions and, of course, all instructions are considered together.

Under Kansas law an insurer is relieved of liability under a life insurance policy if it can prove that the beneficiary procured the policy with the predetermined intent to kill the insured. *Chute v. Old American Ins. Co.*, 6 Kan.App.2d 412, 629 P.2d 734, 738–39. The trial court in the case before us submitted this case to the jury in the form of a special verdict consisting of two questions: Did Lorna Anderson procure the insurance policy on Martin Anderson's life? Did she intend to murder him at the time she procured the policy? The jury found that she did not procure the policy, and it did not address the question of fraudulent intent.

New England argues that the instructions to the jury on the procurement issue were flawed in that they did not take into account the "unique circumstances" of the marital relationship. New England believes that the jury should have been allowed to consider the respective degree of participation of Martin and Lorna Anderson in the procurement of the policy, and that the jury should have been allowed to find that Lorna Anderson indirectly procured the policy even though Martin Anderson may have actually applied for or paid the premium for the policy.

The trial court's instructions on the issue of procurement were straightforward:

"In determining whether the policy of insurance on the life of Martin K. Anderson was procured through fraud, you must determine who actually procured the life insurance policy. If you find that Martin K. Anderson executed the application and procured the insurance for his own purposes and thus became the actual contracting party with the insurance company, then the insurance policy was not procured through fraud and you must find in favor of the defendants.

"If, however, you find by clear and convincing evidence that (1) Lorna Anderson Eldridge conceived the idea of murdering Martin K. Anderson prior to the time the insurance policy was procured, and (2) with that thought in mind Lorna Anderson Eldridge herself procured the policy, either in person or acting through Martin K. Anderson as an innocent instrumentality so that the insurance policy was, in actual effect, at its inception a contract between Lorna Anderson Eldridge and New England Mutual Life Insurance Company, then you must find in favor of the plaintiff.

" 'Procurement' or 'to procure' means to cause a thing to be done, to instigate, to persuade, induce, and prevail upon, to cause a person to do something."

Given the broad definition of "procurement" that New England advanced—the soundness of which we need not consider—the instruction that it proffered and that the trial court rejected differed little from the instructions as given, though it emphasized indirect procurement. The trial court's instruction however permitted the jury to find indirect procurement.

■ The trial court correctly stated the applicable Kansas law concerning "procurement." *See Wheeler v. John Deere Co.*, 862 F.2d 1404, 1411–12 (10th Cir.). New England offers no authority from any common-law jurisdiction to demonstrate otherwise, and instead argues that the procurement instruction was improper because it constituted a "dictionary definition" that failed to reflect the unique circumstances of the case. This objection does not really challenge the validity of the instruction which was adequately related to the law and proof.

New England also urges that the trial court's exclusion of certain evidence and testimony constituted reversible error. It is apparent that the trial court has broad discretion in supervising the fact-finding process, and a decision to admit or exclude evidence will not be overturned on appeal absent a clear abuse of discretion. *Big Horn Coal Co. v. Commonwealth Edison Co.*, 852 F.2d 1259, 1266 (10th Cir.).

On March 17, 1986, the Los Angeles *Times* ran a front-page article entitled "Murderous Affair Shocks Kansas Town," apparently based on interviews of Lorna Anderson and others. In the article it was reported that Lorna Anderson related how she and the Reverend Tom Bird conspired to kill Martin Anderson, and described his murder. New England offered the article at trial. The trial court excluded it as hearsay.

■ These purported admissions in the article were recounted in statements of a third party reporter, who was unavailable for cross-examination, and the statements were offered to prove the truth of the matters asserted. The fact that the statement was in the form of a newspaper account reinforces its hearsay character, for the final product is not the reporter's alone, and it was not demonstrated that the statements as reported were accurate. The article was intended, after all, to capture the interest of Los Angeles readers, who might otherwise have little interest in what occurs in Emporia, Kansas.

At trial and on appeal New England has persistently pointed out that newspapers are self-authenticating under Federal Rule of Evidence 902(6), but there is no such doctrine. New England next points out that the reporter was unavailable to testify; therefore, the article essentially stood in his place, and the jury should have been allowed to read it and judge its credibility in light of the author's unavailability. That the reporter was unavailable to testify, however, does not cure the article's hearsay character, rather his absence gives rise to the hearsay problem. We see no basis for such a "credibility" argument. To say that the hearsay problems with the article merely go to the article's credibility, a matter for the jury, would gut the hearsay rule altogether.

■ Alternatively, New England argues that Lorna Anderson's statements reported in the *Times* article represent adoptive admissions because she never disputed, contradicted, or protested the article's contents. *See* Fed.R.Evid. 801(d)(2). New England did not offer the foundation proof necessary to support the admission of evidence on this basis. As Dean McCormick pointed out, a statement of fact allegedly admitted by a party in failing to deny the truth of the statement

"is not offered as proof of its contents but rather to show what the party acquiesced in, the distinction is indeed a subtle one; the statement is ordinarily highly damaging and of a nature likely to draw attention away from the basic inquiry whether acquiescence did occur."

McCormick on Evidence § 270 (3d ed.1984). New England laid no foundation for the trial court to consider whether or not Lorna Anderson had ever acquiesced in the newspaper account. New England did not establish that she had ever read the *Times* article, or that she was in any position to respond to the article. Furthermore, New England fails to demonstrate that in a case such as this, which gained widespread notoriety and coverage, it was not reasonable for Lorna Anderson to fail to respond to an account of her case appearing in a newspaper published over a thousand miles from the prison in which she was incarcerated. *See United States v. Coppola*, 526 F.2d 764, 769 n. 2 (10th Cir.). ("A trial court should be most reluctant to credit mere silence—inherently ambiguous—as 'conduct' sufficient for adoption of an inculpatory statement.")

■ Finally, New England argues that the article was admissible under the residual hearsay exception, Federal Rule of Evidence 804(b)(5). The trial court found neither the "equivalent circumstantial guarantees of trustworthiness" necessary to support admission of the article under the rule, nor that admission of the article without an opportunity to cross-examine its author

would have served the interests of justice. Appellant fails to identify any such guarantees or to persuade us that the trial court abused its discretion in excluding the *Times* article from evidence. *See United States v. York*, 852 F.2d 221, 225 (7th Cir.) (noting that the party offering the evidence bears the burden of establishing that the evidence offered is trustworthy and entitled to an exception to the hearsay rule).

Unsuccessful in its attempt to introduce the *Times* article head-on, New England sought to introduce it through an examination of Lorna Anderson's current husband, Charles Randall Eldridge, who was present at the reporter's interview of his wife. Counsel for New England apparently intended to question Mr. Eldridge on the *Times* article paragraph by paragraph, just as was done when he examined Mr. Eldridge outside the presence of the jury. Mr. Eldridge testified that he could not recall the interview clearly enough to distinguish Lorna Anderson's statements made during the course of the interview from those she communicated privately to him. The trial court found that Mr. Eldridge's testimony implicated the marital privilege, that there was no evidence that the marital privilege had been waived, and therefore excluded Mr. Eldridge's testimony from trial. New England attacks Mr. Eldridge's credibility on appeal, and argues that because Mr. Eldridge failed to identify or isolate statements made to him in confidence by his wife, that New England should have been allowed to examine him before the jury.

■ Subject to several exceptions which are not applicable here, statements made in confidence to a witness by his spouse are privileged. The trial court had an opportunity to observe Mr. Eldridge's demeanor when he testified out of the presence of the jury that he could not distinguish Lorna Anderson's interview statements from those made to him in confidence, and apparently believed him. The trial court was concerned Mr. Eldridge's testimony before the jury might reveal privileged communications. The decision whether to admit or exclude the testimony was well within the discretion of the trial court.

New England sought to introduce a transcript of Darrell Carter's testimony (an unavailable witness) from Reverend Tom Bird's criminal trial on charges of solicitation to murder. Mr. Carter testified at the trial that he met with Reverend Bird and Lorna Anderson at Faith Lutheran Church in May 1983, at which time they asked for his help in murdering Martin Anderson. Mr. Carter there testified that he asked Lorna Anderson and Reverend Bird why Lorna Anderson did not consider simply divorcing Martin Anderson. Both replied that she wanted the insurance proceeds that would be payable in the event of Martin Anderson's death.

New England argues that Darrell Carter's testimony was admissible under Federal Rule of Evidence 804(b)(1), which states:

"(b) Hearsay exceptions

"The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

"(1) Former testimony

"Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."

*Lloyd v. American Export Lines*, 580 F.2d 1179 (3d Cir.), is a leading case to construe Rule 804(b)(1). *See also Clay v. Johns–Manville Sales Corp.*, 722 F.2d 1289, 1293–95 (6th Cir.); McCormick on Evidence § 256. The court in *Lloyd* adopted an interpretation of "predecessor in interest" that it considered "realistically generous" rather than "formalistically grudging." 580 F.2d at 1187. The court there decided that a "previous party having like motive to develop the testimony about the same material facts is in the final analysis, a predecessor in interest to the present party" for the purposes of the rule. *Id.*

■ Considering the circumstances under which Darrell Carter's testimony was received in Reverend Bird's criminal trial for solicitation to murder, and the motives of Reverend Bird's counsel to develop that testimony on cross-examination which we can discern from the record, we must conclude that Reverend Bird was not a predecessor in interest to Lorna Anderson with respect to the testimony concerning her alleged statements to Darrell Carter. Reverend Bird simply had no motivation to clear Lorna Anderson's name during the course of his criminal trial. In attempting to prevent the State from introducing evidence concerning Lorna Anderson's activities at Reverend Bird's trial, counsel for Reverend Bird observed that her conduct "may very well have been a crime on her part but it certainly isn't—it doesn't tie into the Defendant." Counsel for Reverend Bird was simply not disposed to protect Lorna Anderson's interests in his examination of Darrell Carter as he sought to protect his client. Thus there was no "like motive" to develop the same material facts. Reverend Bird was not Lorna Anderson's predecessor in interest, and the trial court was correct in refusing to admit Darrell Carter's testimony from the earlier trial under the hearsay exception to Rule 804(b)(1). Nor has New England established that the trial court abused its discretion in refusing to admit the testimony pursuant to the residual hearsay exception of Rule 804(b)(5).

Appellant here in a separate appeal (89–3080) advances another argument seeking reversal. After judgment was entered in this case, Lorna Anderson pled guilty in a Kansas state court to second degree murder in the death of her husband. New England then moved for relief from judgment pursuant to Federal Rule of Civil Procedure 60(b)(2), arguing that the plea and transcript of the plea were newly discovered evidence which would have changed the outcome of the trial. The trial court denied New England's motion, concluding that the guilty plea was not relevant to the issue of procurement which was the basis on which the jury reached its verdict. New England's appeal of the trial court's denial of its motion for relief has been consolidated with its appeal from the underlying judgment.

■ The decision whether to grant relief from judgment under Rule 60(b) is committed to the sound discretion to the trial court, and will be overturned on appeal only for an abuse of discretion. *United States v. 31.63 Acres of Land*, 840 F.2d 760, 761 (10th Cir.); *DeVargas v. Montoya*, 796 F.2d 1245, 1258 (10th Cir.). However, to obtain relief from judgment on the basis of newly-discovered evidence under Rule 60(b)(2), a movant must, among other things, show that the evidence was in existence at the time of the trial. Lorna Anderson had not pled guilty to second degree murder at the time of trial, and thus evidence of her plea was not in existence at the time of the trial. However persuasive such evidence might have been in convincing the jury that Lorna Anderson murdered Martin Anderson, New England cannot prevail on a Rule 60 motion on the basis of newly discovered evidence of an event which took place about a year after the trial in this action. *See Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1358 (5th Cir.); *Ryan v. United States Lines Co.*, 303 F.2d 430 (2d Cir.). In any event, New England offered ample evidence that Lorna Anderson murdered her husband, including testimony of damaging statements she made prior to his death, evidence of her affair with Reverend Bird, Daniel Carter's testimony that she and Reverend Bird solicited him to murder Martin Anderson, the transcript of her guilty plea to solicitation to murder, and testimony that she told law enforcement authorities that it was Reverend Tom Bird who shot Martin Anderson to death on the side of the road in her presence.

The trial court did not abuse its discretion in denying New England's motion for relief from judgment.

Accordingly, the judgment of the trial court is AFFIRMED in all respects.